**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Circle K Procurement and Brands Ltd., et al., <br><br>Plaintiffs, <br><br>v. <br><br>O-At-Ka Milk Products Cooperative, Inc., <br><br>Defendant. | No. CV-22-00448-PHX-DGC <br><br>**ORDER** |

Plaintiffs claim that Defendant breached the U.S. National Supplier and Purchase Agreement signed on March 1, 2020 by Defendant O-At-Ka Milk Products Cooperative and Plaintiff Circle K Procurement and Brands (on behalf of the other Plaintiffs). The Agreement obligated Defendant to produce ready to drink ("RTD") coffee products for Plaintiffs' franchisees. Plaintiffs claim that Defendant breached the Agreement by failing to ship the products. Defendant responds that it properly terminated the Agreement.

The parties cross-move for summary judgment, and the Court heard oral arguments on August 9, 2023. Docs. 38, 42. The Court will grant summary judgment in Defendant's favor on Plaintiffs' claims for lost opportunity damages and breach of the covenant of good faith and fair dealing, and otherwise deny the parties' motions. Trial will be scheduled.

**A. Termination of the Agreement.**

Section 6 of the Agreement provides that it would run from March 1, 2020 until February 28, 2023, but that "either party may terminate [the] Agreement at any time, with

or without cause, and without any penalty, upon thirty (30) days prior written notice." Doc. 39-2 at 8. Section 10 states that "[a]ny notice . . . under this Agreement will be effective only if it is in writing and (i) personally delivered, or (ii) sent by a nationally or internationally recognized overnight delivery service" to Plaintiffs' Director of Global Procurement. *Id.* at 11.

Defendant contends that it communicated its termination of the Agreement to Plaintiffs no later than September 15, 2021. Although Defendant did not send a formal notice of termination in accordance with the Agreement, it claims that it communicated the termination repeatedly, in writing and orally, and that Plaintiffs understood Defendant would no longer be supplying RTD coffee products. Defendant argues that it is entitled to summary judgment on Plaintiffs' claims for breach of contract and breach of the implied covenant of good faith and fair dealing. Doc. 38 at 3-13.

Plaintiffs contend that Defendant never communicated its termination of the Agreement to Plaintiffs, failed to deliver products under the Agreement, and therefore breached the Agreement. Doc. 42 at 2-10. Plaintiffs ask the Court to enter summary judgment in their favor on their breach of contract claim in the amount of $562,075, leaving Plaintiffs' lost opportunity damages for trial. *Id.*

The Agreement is governed by Indiana law (Doc. 39-2 at 14), and the parties appear to agree on the legal standard that governs contract termination. They each cite the following cases: *Goodman Jewelers, Inc. v. Walnut Brewery, Inc.*, 2011 WL 3667714, at *16 (S.D. Ind. Aug. 22, 2011) ("[W]here actual notice indisputably occurred, minor deviations from the contract terms governing notice do not render the notice defective."); *Wanna v. Navicent Health, Inc.*, 850 S.E.2d 191, 201-02 (Ga. Ct. App. 2020) ("Substantial compliance with a notice provision governing the termination of a contract may suffice as long as the contemplated information is communicated." (cleaned up)); *Onthank v. Onthank*, 260 A.3d 575, 581-82 (Conn. Ct. App. 2021) ("This court repeatedly has applied the substantial performance doctrine in determining whether a contractual notice requirement has been satisfied in a given case, generally with respect to the contents of the

notice itself."); *Prudential Ins. Co. of Am. v. Newman*, 2019 WL 4750014, at 16 n.20 (N.D. Ill. Sept. 30, 2019) ("[A] contracting party's technical non-compliance with the precise requirements of a notice provision does not preclude that party from enforcing its rights under the contract if the intended recipient received actual notice, because the non-compliance is not a material breach of contract by the party providing notice."). *See* Docs. 38 at 8-9, 42 at 9-10.

The only Indiana case in this list, *Goodman Jewelers*, concerned a notice to extend a lease, not a notice to terminate a contract. *See* 2011 WL 3667714, at *1. *Goodman Jewelers* found no Indiana case directly on point, but noted that Indiana courts generally hold "that the optionee [under a lease extension] must strictly adhere to the option's requirements for its exercise in order to bind the optionor." *Id.* at *5 (citing *Rowland v. Amoco Oil Co.*, 432 N.E.2d 414, 417 (Ind. Ct. App. 1982); *Pinkowski v. Calumet Twp. of Lake Cnty.*, 852 N.E.2d 971, 982 (Ind. Ct. App. 2006) (reiterating "clear and unequivocal" language); *Candlelight Props., LLC v. MHC Operating Ltd. P'ship*, 750 N.E.2d 1, 12 (Ind. Ct. App. 2001) (holding that optionee's "inadvertent omission of the words from its notice in and of itself was immaterial and did not affect its notice of its intention to exercise the option to purchase")). The parties do not discuss the cases cited in *Goodman Jewelers*, nor any other Indiana authority. The Court will leave to a later date the precise Indiana jury instructions to be given on the notice of termination. For today's ruling, the Court focuses on the issue framed by the parties – whether Defendant's termination of the Agreement was clearly communicated. On this issue, there is a clear dispute of fact.

Defendant cites various communications to Plaintiffs which, Defendant claims, stated that it would be phasing out of the glass RTD business and intended to terminate the Agreement, as well as testimony by Plaintiffs' employees suggesting they understood that termination was intended. Defendant also argues that its intent to terminate was clearly communicated to Plaintiffs in a September 15, 2021 phone call between the parties. And Defendant notes that Plaintiffs began searching for an alternative supplier of RTD coffee products shortly after this call. *See, e.g.*, Doc. 38 at 4-6.

3

Plaintiffs counter with the undisputed fact that no formal notice of termination was ever sent by Defendant (even though Defendant promised one). Plaintiffs also argue that the emails and letters relied on by Defendant were unclear or equivocal, and cite testimony from their employees that Defendant expressed interest in making the Agreement work. Plaintiffs note that Defendant never indicated the Agreement had been terminated when Plaintiffs sent a notice of default in November 2021 or inquired about remaining inventory. *See, e.g.*, Doc. 46 at 2-9.

The Court has reviewed the documents and testimony relied on by each side and finds a clear factual dispute. A jury must decide whether Defendant clearly communicated an intent to terminate the Agreement. Summary judgment cannot be entered for either side on this issue.

**B.     Defendant's Claim of a 30-day Damages Limitation.**

Defendant argues that Plaintiffs' damages, if any, are limited to those incurred during the 30-day notice-of-termination period provided in the Agreement. Doc. 38 at 13-14. Defendant contends this would be the 30 days following September 15, 2021, the date of the phone call which, it claims, clearly communicated its intent to terminate the Agreement.

Defendant relies on *Duncan v. Greater Brownsburg Chamber of Commerce, Inc*., 967 N.E.2d 55 (Ind. Ct. App. 2012), which held that an employee who was terminated in violation of his employment contract's 30-day notice requirement could recover damages (lost wages and benefits) only for the 30 days of the notice period: "[T]oday we adopt the majority rule that the summary discharge of an employee entitled under the employment contract to a specified period of notice ordinarily permits him to recover his compensation for the notice period only and not for the entire balance of the contract period." *Id.* at 58-59 (cleaned up). Plaintiffs argue that *Duncan* does not apply here because it concerned an employment contract, not a commercial supply contract like the Agreement. Plaintiffs cite no authority recognizing this distinction. *See* Doc. 42 at 10-12.

The rationale underlying *Duncan* is plain. The employer was entitled under the contract to terminate the employee with 30 days' notice. If the notice was given, the employee could work and be paid for another 30 days, but would be entitled to no further compensation after the notice period ended. The protection provided the employee by the notice requirement was 30 days of compensation after the decision to terminate him had been made, coupled with knowledge that he needed to find another job.

When the employer breached the notice provision in *Duncan* by firing the employee immediately – without the 30 days' notice – there was no doubt that the employee had been terminated. The firing clearly communicated that fact. The benefit the contract promised upon firing was 30 days of compensation. And because the employee had been promised nothing beyond 30 days, he could not recover damages for additional months of lost compensation.

The purpose of the notice provision in the Agreement appears similar in some respects. Either side could terminate the Agreement with 30 days' notice, with or without cause. If the notice was given, the other side would receive 30 days of performance, but would be entitled to no further performance after the notice period. The termination protection provided by the Agreement was 30 days of continued business, coupled with knowledge that the Agreement was being terminated so the other side could find another supplier or customer to make up for the lost business.

But there is also a significant difference between the employment contract at issue in *Duncan* and the Agreement at issue here. The Agreement contains a cure provision. It states that if a party "fails to perform any material obligation under this Agreement," the "non-defaulting Party shall send the defaulting Party a written notice identifying the Default and requesting that such Default be cured within thirty (30) calendar days." Doc. 39-2 at 9. If cure was not made, the non-defaulting party could terminate the contract. *Id.*[1]

---

[1] Admittedly, the Agreement is not entirely consistent because it could be terminated even after the cure, without or without cause, on 30 days' notice. *Id.* at 8.

Thus, if Defendant stopped providing RTD coffee products to Plaintiffs without ever notifying Plaintiffs that the Agreement was being terminated, the Agreement would not immediately end as did the employment in *Duncan*. Plaintiffs could provide a default notice, Defendant could cure the default, and the Agreement would continue. Thus, a firing without notice in the employment context has quite a different effect than a failure to ship product without notice under the Agreement. If the non-breaching party continues to work with or wait for the breaching party to resolve its difficulties and perform (as Plaintiffs claim they did here), rather than immediately sending a default notice and terminating the contract, it is not clear that losses resulting from the ongoing non-performance should be limited to 30 days of damages. In fact, it could be said that the 30-day notice requirement was really provided for the benefit of the non-performing party – to give it a 30-day exit from the Agreement if it could not or chose not to perform. If the non-performing party fails to take advantage of the notice provision by sending clear notice, it arguably cannot claim the provision's benefit of a 30-day limit on liability.

What is more, while firing without notice in the employment context can rightly be viewed as breach of the notice provision, failure to perform under the Agreement without notice of termination appears to be a breach of the Agreement, not of the notice provision. Indeed, this seems to be part of the thought behind the cure provision – that the non-performing party may not wish to terminate the Agreement and may cure its failure and continue to perform once notified of the default. If a party breaches the Agreement by non-performance, it would appear to be a straight breach of contract, and it would seem unfair to limit damages to the 30 days of the notice provision the party never invoked.

As noted above, whether Defendant terminated the contract by providing clear notice is a question the jury must resolve in this case. If the jury finds that Defendant provided such notice, it seems clear that Plaintiffs are entitled to nothing more than an additional 30 days of performance, or any damages arising during that period if Defendant did not perform. But if the jury finds that Defendant failed to provide clear notice of

termination and yet did not meet its performance obligations under the Agreement, it is not clear why the notice provision should have any limiting effect on damages.

The parties do not discuss the effect of the Agreement's cure provision on this issue. Nor do they cite case law addressing whether *Duncan* and similar cases apply in a commercial setting with a cure provision. As a result, the Court cannot finally determine whether the 30-day provision should act as a limitation on damages if no clear notice of termination was given, and will deny the parties' cross-requests for summary judgment on this issue. The parties should research this issue and be prepared to propose appropriate instructions to guide the jury in deciding the effect, if any, of the notice provision on damages if the jury finds that notice was not clearly given.

One final argument should be addressed. The last paragraph of Section 6 of the Agreement requires the parties, "upon termination," to use "commercially reasonable efforts" to assist each other "in carrying out and effectuating the termination . . . ." Doc. 43-1 at 10. The parties agree that this language applies only "upon termination" – when the Agreement has been terminated by clear notice. If the jury finds that Defendant gave clear notice of termination, Plaintiffs argue that this language required Defendant to continue selling RTD coffee products to Plaintiffs as long as Plaintiffs had not found a substitute supplier, even beyond the 30-day notice period. In other words, they claim that the 30-day period places no limitation on damages even when the Agreement is properly terminated. The Court is not persuaded. Assisting the other party "in carrying out and effectuating the termination" of the Agreement does not reasonably mean continuing to perform beyond the termination period.

C.   **Plaintiffs' Claim for Lost Opportunity Damages.**

Defendant asks the Court to enter summary judgment on Plaintiffs' claim for lost opportunity damages (Plaintiffs also call them "lost resources" damages). Doc. 38 at 14. Defendant argues that Plaintiffs have failed to present sufficient evidence of such damages.

Where discovery has been completed, summary judgment is appropriate when a party challenged by motion fails to offer evidence supporting an element of a claim on

7

which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).  And only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment – the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Plaintiffs fail to present evidence from which a reasonable jury could find lost opportunity damages.  Plaintiffs' interrogatory answers describe the claim for lost opportunity damages in these words:

> As is easy to imagine, the effort and time that goes into finding a supplier, negotiating a deal, finalizing a contract and preparing fourteen (14) business units for the launch of a new product is extensive.  Indeed, no less than six levels of management are involved and each store must spend administrative and stocking time (at a minimum) to replace the product and in-store advertisement and systems related to the same.  Conservatively, based upon the hours expended and the salaries of those involved, at least $250,000 in direct human resources were expended to replace [Defendant] after it breach[ed] the National Agreement and refused to supply Product which would not have been expended on this category but for [Defendant's] breach of the National Agreement.

Doc. 39-2 at 93.

Plaintiffs present no expert witness to support this assertion.  Instead, Plaintiffs proffer their employee, Thomas M. Becker, as the proposed witness, asserting that he "testified at great length regarding Plaintiffs' lost opportunity[] damages" in his deposition.  Doc. 43 at 10.  Plaintiffs then cite seven pages of Mr. Becker's deposition.  Doc. 43-1 at 66-73.  Plaintiffs also provide one-half of a one-page summary slide labelled "New Age Beverage – Additional Considerations."  Doc. 39-2 at 97.  The slide asserts, in conclusory fashion, that switching to a different supplier required Plaintiffs to expend 545 hours from 6 managers, 10,686 hours from 5,343 store managers, and 225 hours from 29 other employees.  *Id.*  No information is provided about the wages these various managers and employees were paid.  Without showing the calculation, the slide simply claims that Plaintiffs have been "damaged in excess of $250,000 in direct human resources."  *Id.*

8

The seven pages of Becker's deposition testimony do nothing to raise confidence in this damages estimate. Becker testifies that (1) the supporting one-page slide was created for a different lawsuit involving a different supplier, not for Defendant's alleged breach of the Agreement (Doc. 43-1 at 67-68); (2) the hours shown in the slide are not based on tracking manager or employee time or on other business records, but instead are simply Becker's "best guess" (*id.* at 69-70); (3) Becker did not interview the individuals identified on the slide, but only talked with his boss and other unnamed individuals to see if his numbers were reasonable (*id.* at 71); (4) Becker never reviewed salary information in connection with his damages estimate (*id.* at 72-73); and (5) Becker did not know what salary numbers he multiplied against his hours to produce the $250,000 damages estimate, again testifying that he simply used his "best guess" (*id.* at 73).

The Ninth Circuit holds that a plaintiff "must provide evidence such that the jury is not left to speculation or guesswork in determining the amount of damages to award. Thus, summary judgment is appropriate where [plaintiffs] have no expert witnesses or designated documents providing competent evidence from which a jury could fairly estimate damages." *Weinberg v. Whatcom Cnty.*, 241 F.3d 746, 751 (9th Cir. 2001) (cleaned up); *see also Ponziano Constr. Servs. Inc. v. Quadri Enters., LLC*, 980 N.E.2d 867, 873 (Ind. Ct. App. 2012) (explaining that while "mathematical certainty" is not required, the amount of damages "must be supported by evidence in the record, and may not be based on mere conjecture, speculation, or guesswork" (citation omitted)).

Becker's testimony is based on guesses used to estimate losses from the breach of a different supplier in a different lawsuit. Asking jurors to award damages to Plaintiffs on this basis would leave the jurors with nothing more than "speculation or guesswork," which the Court cannot do. *Weinberg*, 241 F.3d at 751. Because Plaintiffs fail to present sufficient evidence for a jury to find in their favor on lost opportunity damages, the Court will grant summary judgment to Defendant on this issue.

/ / /

/ / /

9

### D.     Breach of Covenant of Good Faith and Fair Dealing.

Defendant contends that Indiana law does not imply a covenant of good faith and fair dealing in a commercial contract like the Agreement, and that Plaintiffs' claim for breach of the covenant therefore must fail.  Doc. 38 at 12-13.  The Court agrees.

"Indiana courts have recognized an implied covenant of good faith and fair dealing in contract law, but generally only in limited circumstances involving employment contracts and insurance contracts." *Allison v. Union Hosp., Inc.*, 883 N.E.2d 113, 123 (Ind. Ct. App. 2008) (citation omitted); *see also Hisp. Coll. Fund, Inc. v. Nat'l Collegiate Athletic Ass'n*, 826 N.E.2d 652, 658 (Ind. Ct. App. 2005) ("We note initially that Indiana law does not impose a generalized duty of good faith and fair dealing on every contract."); *Perfect Flowers, Inc. v. Teleflora LLC*, 2012 WL 2994636, at *3 (S.D. Ind. July 20, 2012) ("Plaintiff contends that, although no specific provision of the contract was breached, Defendant breached its obligation of good faith and fair dealing by exceeding the scope of the contract.  However, contrary to Plaintiff's assertions otherwise, 'Indiana law does not impose a generalized duty of good faith and fair dealing on every contract.'" (citations omitted)).

Plaintiffs do not dispute this case law.  Doc. 42 at 13-14.  They instead argue that if the Court finds that the 30-day termination provision limits their damages, it must imply a covenant of good faith and fair dealing so the Agreement is not illusory.  *Id.*

The Court does not agree.  If a 30-day damages limitation applies when effective notice of termination is given, and – as the Court is inclined to hold – does not apply when effective notice of termination is not given, the limitation applies only in the circumstances where Plaintiffs and Defendant agreed it would apply when they signed the contract.  These sophisticated parties knowingly gave each other a 30-day exit opportunity from the Agreement.  The Court will follow the Indiana general rule that a covenant of good faith and fair dealing is not implied in regular commercial contracts.

/ / /

/ / /

**IT IS ORDERED:**

1. Defendant's motion for summary judgment (Doc. 38) is **granted in part and denied in part**. Summary judgment is granted for Defendant on Plaintiffs' claims for lost opportunity damages and for breach of the covenant of good faith and fair dealing, and otherwise is denied.

2. Plaintiffs' cross-motion for summary judgment (Doc. 42) is **denied**.[2]

3. The parties' joint motion to seal Exhibit I to the Declaration of Jerauld Brydges (Doc. 40) is **granted**. The Clerk is directed to file the lodged document (Doc. 41) under seal with the same document number.

4. The Court will schedule a telephone hearing to set a final pretrial conference and trial date.

Dated this 11th day of August, 2023.

*David G. Campbell*
_____
David G. Campbell
Senior United States District Judge

---

[2] Plaintiffs ask the Court to enter summary judgment in their favor on their breach of contract claim in the amount of $562,075. Doc. 42 at 14-15. But whether Defendant properly terminated the Agreement or breached it, and the amount of any damages due, must be determined at trial for reasons set forth in this order. Plaintiffs also ask the Court to find that Defendant has not effectively disputed the $562,075 in damages found by Plaintiffs' expert. *Id.* It will be the jury's task to decide what the experts have or have not established. The Court notes, however, that expert testimony will be limited as stated in the Case Management Order. *See* Doc. 12 ¶ 5.f.